```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
                         HAMMOND DIVISION


MATTHEW ROSA,                    )
                                 )
          Plaintiff,             )
                                 )
     v.                          )   Case No. 2:04 cv 190
                                 )
VALPARAISO COMMUNITY SCHOOLS     )
of Valparaiso, Indiana,          )
KENNETH BRIST, individually      )
and in his official capacity     )
as Principal for Valparaiso      )
Community Schools, GEORGE        )
GORDON, individually and in      )
his official capacity as         )
Assistant Principal for          )
Valparaiso Community             )
Schools, CELESS JANEWAY  and     )
ANDREA RICK                      )
                                 )
          Defendants             )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendants, Valparaiso Community Schools ("VCS"), Kenneth Brist, and George Gordon, on August 31, 2005, and the Motion for Summary Judgment filed by the defendant, Celess Janeway, on August 31, 2005. For the reasons set forth below, these motions are **GRANTED**.

Background

The admissible evidence, viewed in the light most favorable to the plaintiff, Matthew Rosa, is as follows.  Matthew transferred to Valparaiso High School in 2003, during his sophomore year. (Matthew Rosa Dep. p. 27)  Before the class day began on November 17, 2003, he was walking down the hallway with his friend Miguel when they passed a group of girls, including

defendants Andrea Hric and Celess Janeway. (M. Rosa Dep. pp. 35-36; Celess Janeway Dep. p. 60)  The girls were muttering words like "bitch" and "pussy" amongst themselves. (M. Rosa Dep. pp. 36, 38)  Matthew saw that Miguel was looking over to them and that they were looking up at Miguel. (M. Rosa Dep. p. 36) Matthew did not make eye contact with the girls. (M. Rosa Dep. pp. 102-03)

When Matthew, Miguel, and another friend, Jamal, walked past the girls a second time, either Hric or Janeway said, "All those niggers look alike."[1] (M. Rosa Dep. p. 39; Hric Dep. p. 16; Janeway Dep. p. 54)  Matthew turned around and asked who the girl was talking to, and she stood up, responded that she was talking to Matthew, and "jerked her body forward like [Matthew] was supposed to come at her."  (M. Rosa Dep. pp. 40-41)  At the time this comment was made, Matthew and the girl were not close enough to touch. (M. Rosa Dep. p. 41)  Matthew responded that she had "a lot of balls calling me that when I'm down here. When I was right in front of you, you couldn't say anything." The girl said that she did not have any balls, and Matthew responded that she did--they were in her mouth. He then walked away.  (M. Rosa Dep. p. 42)

Matthew did not know who the girls were during this incident. (M. Rosa Dep. p. 37)  Although Matthew learned Janeway's first name from Miguel immediately after the verbal exchange, he

---

[1]  Matthew believed that Janeway made the comments and that Hric merely was with her in 2003. (M. Rosa Dep. pp. 44-45)  He denies that Hric said anything to him in 2003. (M. Rosa Dep. p. 45)

2

did not know Hric's name, or even that she was present during the exchange, until sometime later. (M. Rosa Dep. pp. 44-45, 112) Despite being told that the girl who yelled was Janeway, Matthew remained unsure of her identity, and the record is unclear as to whether the Rosas ever told a school official the names of the girls who were involved in this exchange. (M. Rosa Dep. pp. 52-53; Pamela Rosa Dep. pp. 20, 25)

At the time of this incident, no teachers were in the hallway. (M. Rosa Dep. p. 46) Matthew did not report the exchange to anyone at the school during the day, but he told his mother, Pamela Rosa, when he got home from school. (M. Rosa Dep. p. 48)

The next day, Pamela called the school and scheduled a meeting with Kenneth Brist, the principal, and George Gordon, the assistant principal, for that morning. (P. Rosa Dep. p. 23) During the meeting, which Matthew also attended, Brist and Gordon assured Pamela that there would be an investigation.  They allegedly "looked at each other and chuckled" when Pamela told them that Matthew was half Polish and half Puerto Rican, which did not make him a "nigger." (P. Rosa Dep. p. 24; M. Rosa Dep. p. 52)

There is no evidence that Janeway or Hric were called into the principal's office for this incident. (P. Rosa Dep. pp. 24-25) However, Gordon later gave Matthew an alternative route through the school to his bus so that he would not go down the hallway where the girls were and threatened to suspend Matthew if Gordon saw him in that hallway.  (M. Rosa Dep. p. 58) This

3

arrangement was the same one that Gordon had ordered Janeway and Miguel to follow in response to ongoing problems between them. (Janeway Dep. p. 34) Matthew disregarded Gordon's orders and continued to use the hallway every day, but he did not see the girls again. (M. Rosa Dep. p. 59)

Nothing further happened until two months later, on January 8, 2004. (M. Rosa Dep. pp. 53-54)  That day, Matthew and Miguel approached the pay phones near the school bookstore so that Matthew could make a call.  A group of girls, including the girl that Matthew believed to be Janeway, was near the bookstore, but Matthew ignored them.  (M. Rosa Dep. pp. 54-55, 67) When Matthew realized that he did not have change for the phone, he and Miguel left to get money. When they returned to the phone, Matthew noticed the word "nigger" written about an inch long in black ink on the phone. The girls no longer were in the area. (M. Rosa Dep. p. 65)

Matthew called his mother who instructed him to tell Gordon and to call her from Gordon's office to tell her how the meeting went.  (M. Rosa Dep. p. 65) During the meeting, Gordon asked what happened, and Matthew said that they "didn't see anybody."  Gordon then said, "[I]f that's the case . . . it's just another case of he said, she said" and that without proof, he could not act. (M. Rosa Dep. p. 66) Matthew then returned to the pay phone to call his mother. (M. Rosa Dep. p. 67) As he was talking with her, Gordon approached, asked to see the writing on the phone, and then directed Matthew to go to class. (M. Rosa Dep. p. 73)

Later that day, Gordon asked Janeway if she had written on the phone. When she denied it, he told her that if she had in fact done so, they would find out because the school had a videotape. (Janeway Dep. p. 45; Def. Ans. Interrog. 3) Neither Janeway nor Hric were punished for the phone incident. (Hric Dep. p. 13; Janeway Dep. p. 46) Gordon later informed Janeway that she had not been the student to write on the phone. (Janeway Dep. p. 46)  Matthew did not see the girls again for the remainder of his time at Valparaiso High School. (M. Rosa Dep. p. 82)

The day after this second incident, Pamela again contacted the school.  (P. Rosa Dep. p. 37) Matthew's father, Antonio Rosa, also called Matthew's guidance counselor.  (Antonio Rosa Dep. pp. 21-22) The same day, Gordon scheduled a meeting with the Rosas. (A. Rosa Dep. p. 22) At the time of this meeting, the Rosas still did not know Hric's name or Janeway's last name.  (A. Rosa Dep. p. 25) However, Matthew recognized Janeway in a photograph on Brist's desk and pointed her out during the meeting. (A. Rosa Dep. p. 25) After filing this suit, the Rosas looked up Hric and Janeway's names in the high school yearbook.  (A. Rosa Dep. p. 25; M. Rosa Dep. p. 110)

At the meeting, Brist recommended that Matthew get to know a Hispanic teacher at the school.  Antonio asked if Brist intended for Matthew to "be with someone of his kind" and Brist said, "Pretty much." (A. Rosa Dep. p. 24) The Rosas, Brist, and Gordon then viewed portions of a videotape depicting Matthew and Miguel at the pay phone the first two times.  However, the video did not

5

show the phone during the boys' absence between the two trips to the phone. (M. Rosa Dep. pp. 80-81). Antonio and Pamela felt that the tape was altered because it skipped and jumped and because it did not show the third time Matthew went to the phone.  (A. Rosa Dep. pp. 27-28; P. Rosa Dep. p. 47) However, neither parent has experience with videotapes or videography, and the tape itself has not been offered into evidence. ( A. Rosa Dep. pp. 29-30)

At some point after the second incident, Pamela also told Gordon that two male students who are not parties to this suit would point at Matthew or sing rap songs when he passed. (P. Rosa Dep. pp. 18, 27, 60, 62) This happened on four or five occasions, but Matthew just ignored it and did not report it to the school. (M. Rosa Dep. p 56) According to him, it was "nothing too serious to actually bring to anybody's attention." (M. Rosa Dep. pp. 83-84)

On January 13, 2004, four days after the Rosas' second meeting with Brist and Gordon, the Rosas pulled Matthew out of Valparaiso High School. (P. Rosa Dep. p. 56; Def. Ans. to Interrog. 3)  On January 30, 2004, Matthew formally withdrew from school. (Def. Ans. Interrog. 3) During the January 30 meeting, Antonio wrote on the withdrawal papers that Matthew was being withdrawn due to racial discrimination, and then he refused to sign the papers until Brist had signed them with the changes. (A. Rosa Dep. p. 38) Also during this meeting, Gordon suggested that Matthew go to an alternative school located on the campus of

6

Valparaiso High School. (A. Rosa Dep. pp. 32-33, M. Rosa Dep. p. 93)

When Pamela called the principal of the alternative school, Kathy Spears, Spears asked "how dark" Matthew was, how he dressed, wore his hair, and if he wore earrings. (P. Rosa Dep. p. 51) Because these questions made the Rosas uncomfortable in light of Matthew's other experiences, they elected not to have Matthew attend the alternative school. (P. Rosa Dep. p. 52; A. Rosa Dep. p. 36)

On September 20, 2004, Matthew filed a 14 count complaint asserting various discrimination, conspiracy, intentional infliction of emotional distress, defamation, and negligence claims under a variety of legal theories.  On August 31, 2005, all defendants except Hric, who is proceeding *pro se*, filed motions for summary judgment.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); **Lawrence v. Kenosha County**, 391 F.3d 837, 841 (7th Cir. 2004); **Branham v. Snow**, 392 F.3d 896, 901 (7th Cir. 2004); **Windle v. City of Marion**, **Indiana**, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no

material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party.  *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Lawrence*, 391 F.3d at 841; *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts.  *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990).  Finally, summary judgment "will not be defeated simply because motive or intent are involved."  *Roger v. Yellow Freight Systems, Inc*., 21 F.3d 146, 148 (7th Cir. 1994).  *See also Miller v. Borden, Inc*., 168 F.3d 308, 312 (7th Cir. 1999); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the

8

> need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

See also, ***Reeves v. Sanderson Plumbing Prods., Inc***., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); ***Celotex Corp***., 477 U.S. at 322-323, 106 S.Ct. at 2553; ***Branham***, 392 F.3d at 901; ***Lawrence***, 391 F.3d at 841; ***Hottenroth***, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); ***Schuster v. Lucent Technologies, Inc***., 327 F.3d 569, 573 (7th Cir. 2003) (stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

Before proceeding to the merits of this case, the court must clarify which claims are properly before the court on summary judgment.

The first seven counts of Matthew's Amended Complaint are barred by law. These counts assert violations of 42 U.S.C. §§ 1983 (Counts I-III), 1985(3) (Count IV), and 1986 (Counts V-VII), which is dependent upon a §1985(3) claim. The Seventh Circuit explicitly has held that these claims are preempted by Title VI

9

of the Civil Rights Act of 1964, 42 U.S.C. ß2000d *et seq*. *See* **Boulahanis v. Board of Regents**, 198 F.3d 633, 641 (7th Cir. 1999) ("Where Congress has set up an enforcement mechanism with full remedies, as it has with Title VI, that regulatory structure may not be bypassed by resort to laws of more general applicability like Section 1983 and Section 1985(3)."). The plaintiff concedes this point by failing to cite any law in support of his two-sentence response that these claims are not precluded. *See* **Anderson v. Trans Union, L.L.C.**, 345 F.Supp.2d 963, 975 (W.D. Wis. 2004) ("[F]ailure to develop an argument constitutes waiver.").

In addition, Counts XII-XIV fail as a matter of law. These counts allege that VCS, Brist, and Gordon breached their duty to provide equal educational opportunities by failing to stop the racial harassment. The plaintiff does not state a legal basis for these claims, but the complaint sounds in state common law for the tort of negligence. There is no state law case authority establishing this alleged duty. Moreover, the court notes that the defendants' actions must exceed negligence in order for the school to be held liable under the Civil Rights Act and that negligence is not an element of a Title VI claim. *See* **Board of the County Commissioners of Bryan County, Oklahoma v. Brown**, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); **Craft v. Board of Trustees of University of Illinois**, 793 F.2d 140, 141-42 (7th Cir. 1986). In any event, the plaintiff has failed to defend these claims on summary judgment. *See* Federal

Rule of Civil Procedure 56(e); ***Coe v. Cryovac, Inc.***, ___ F.Supp.2d ___, 2005 WL 2709631, at *4 (S.D. Ind. Oct. 21, 2005). Consequently, summary judgment is granted on Counts XII-XIV as well.

In sum, the only claims properly before the court on summary judgment are a claim for race discrimination by VCS under Title VI (Count IX), a claim for violation of 42 U.S.C. ß1981 (Count VIII) by all defendants, a claim for intentional infliction of emotional distress by defendants Hric and Janeway (Count X), and a claim for defamation (Count XI) by Hric and Janeway.

Title VI permits private individuals to file suit based on intentional race discrimination "under any program or activity receiving Federal financial assistance." *See* 42 U.S.C. ß2000d. *See also* ***Alexander v. Sandoval***, 532 U.S. 275, 280, 121 S.Ct. 1511, 1516, 149 L.Ed.2d 517 (2001) (noting that private individuals cannot sue under Title VI for disparate-impact discrimination); ***Brewer v. Board of Trustees of the University of Illinois***, ___ F.Supp.2d ___, 2005 WL 3527608, at *21 (C.D. Ill. 2005). VCS applies Title IX law to the plaintiff's Title VI claim because Title IX typically governs claims arising from student-on-student harassment, albeit in the context of sexual discrimination. *See* ***Alexander***, 532 U.S. at 280, 121 S.Ct. at 1516 (looking to Title IX to interpret Title VI). *See also* ***Jackson v. Birmingham Board of Education***, ___ U.S. ___, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361 (2005) (noting that student-on-student sexual harassment falls under Title IX); ***Davis v. Monroe County Board of Education***, 526

11

U.S. 629, 643-47, 119 S.Ct. 1672-73, 143 L.Ed.2d 839 (1999) (same). Because the only legal citation provided by the plaintiff for his Title VI claim is a quotation from VCS's brief, the court will assume that Title IX caselaw applies in this case.

A school is liable for student-on-student harassment only when the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S.Ct. at 1674. The first inquiry under this rule is whether the harassing conduct is "'so severe, pervasive, and objectively offensive' that it has a 'concrete negative effect' on the victim's access to education." *Gabrielle M. v. Park Forest-Chicago Heights, Illinois School District 163*, 315 F.3d 817, 821 (7th Cir. 2003) (*quoting Davis*, 526 U.S. at 650, 119 S.Ct. at 1675). The court determines whether the harassment is "objectively offensive" under the "totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with . . . the student's educational opportunities." *Hendrichsen v. Ball State University*, 107 Fed. Appx. 680, 684 (7th Cir. 2004).

If the plaintiff meets this first test, then the court must determine whether the school's response to the harassment was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S.Ct. at 1674. *See also Gabrielle M.*, 315 F.3d at 823. However, the school is not required to take any action unless it has actual knowledge of the harassing

12

conduct. *See **Davis***, 526 U.S. at 650, 119 S.Ct. at 1675.  Moreover, no particular disciplinary action is required; the school merely must respond reasonably.  *See **Davis***, 526 U.S. at 648, 119 S.Ct. at 1674.  In considering the school's response, the court "should refrain from second-guessing the disciplinary decisions made by school administrators." *See **Davis***, 526 U.S. at 648, 119 S.Ct. at 1674.

The conduct of Rosa's classmates does not rise to the level of "severe, pervasive, and objectionably offensive conduct."  First, the school had no actual knowledge that students were singing rap songs at Matthew until his parents took him out of school.  Regardless, while Pamela felt that this conduct was disturbing, Matthew testified that it was not serious enough to bring to the school's attention. (M. Rosa Dep. pp. 83-84) With respect to the remaining two incidents, the evidence is that these incidents occurred two months apart and did not involve any physical contact, that Matthew did not see the girls whom he believed to be involved in these incidents during the remainder of the year, that neither Janeway nor Hric had any idea who Matthew was, and that at least one of the girls had a problem with Miguel severe enough to require school intervention.  Moreover, Matthew did not actually see anyone write "nigger" on the phone in January 2004, and he exchanged similarly foul--though not racially derogatory--words with a girl he believes to be Janeway in November 2003.  Under these circumstances, the

13

alleged harassment fails the threshold test for peer-on-peer harassment.

Even assuming that the harassment did satisfy the threshold inquiry, Matthew still has failed to show that the school's response was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S.Ct. at 1674.  Brist and Gordon met with Pamela and Matthew the same day they were notified by Pamela of the November 2003 incident. While the school promised an investigation, Matthew has not established that he told Brist and Gordon who the girl was that made the comment about "all niggers" looking alike or that Matthew himself knew who she was. Given these circumstances, it was reasonable for the school not to single out Hric or Janeway for discipline. Moreover, Gordon gave Matthew an alternative route to his bus that would avoid the area where Matthew previously met the girls. While Matthew disputes the merit of this solution, there is no evidence that this arrangement was any different from the discipline Gordon imposed on other students, including Janeway and Miguel. The court finds this response fully reasonable.

The school's response to the 2004 incident also was not clearly unreasonable.  Matthew did not know who had written on the phone, and Gordon reasonably declined to discipline a student on Matthew's "feeling" that she was at fault. However, Gordon did ask Janeway whether she had written on the phone.  In addition, Brist and Gordon met with the Rosas within 24 hours of the incident, viewed a video of the payphones with them (which did

14

not show anyone writing on the phone during the relevant period), and suggested that Matthew meet with a Hispanic teacher.  Even if this teacher was recommended because of his racial similarity to Matthew, no reasonable juror could find that the school's suggestion was intentionally discriminatory or in any way impacted Matthew's access to education. In addition, the court cannot draw an adverse inference from VCS's failure to produce the video when the plaintiff has not met his burden to show that the video was destroyed in bad faith.  *See* ***Park v. City of Chicago***, 297 F.3d 606, 615 (7th Cir. 2002). Finally, the evidence shows that Matthew still did not know who Hric was at this time, and even if he did, that Matthew told the school who she was.  For these reasons, Matthew's Title VI claim fails.[2]

Summary judgment also is appropriate on Matthew's ß1981 claim, as ß1981 and Title VI both proscribe discrimination coextensive with the Equal Protection Clause. *See* ***Grutter v. Bolinger***, 539 U.S. 306, 343, 123 S.Ct. 2325, 2346, 156 L.Ed.2d 304 (2003).  Just as under Title VI, the court finds that the comments in this case are neither severe, pervasive, nor objectively hostile enough to satisfy a *prima facie* case for ß1981 against any defendant. For this reason, the court need not reach the question of qualified immunity raised by Brist and Gordon.

---

[2] While Spears' comments following Matthew's withdrawal may be stronger evidence of a discriminatory animus, the plaintiff does not reference them, let alone allege that these comments are part of his case against VCS.  For this reason, the court declines to consider them here.

The plaintiff's state law claim for intentional infliction of emotional distress also fails as a matter of law. To establish intentional infliction of emotional distress, the plaintiff must show that the defendant "(1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Lachenman v. Stice*, 838 N.E.2d 451, 456 (Ind. App. 2005). To be judged as extreme and outrageous,

> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized as 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. (internal citations omitted)
>
> *Lachenman*, 838 N.E.2d at 456-57 (*quoting Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. App. 1999)

The facts of this case are not so severe. As a preliminary matter, the court notes that the plaintiff has not shown with certainty which girl made the statements to him in 2003 or wrote on the phone in 2004. While this uncertainty creates a factual dispute, it is not material because seeing the graffiti "nigger"

16

on a phone and hearing someone make a comment that "all niggers look alike," while unfortunate, does not exceed the bounds usually tolerated by society.  For this reason, summary judgment must be granted on this claim.

The plaintiff's defamation claim also is without merit. Under Indiana law, "defamation is 'that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff.'" ***Shine v. Loomis***, 836 N.E.2d 952, 956 (Ind. App. 2005).  To prove defamation, the plaintiff must establish "(1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." ***Shine***, 836 N.E.2d at 956.  The name-calling here simply does not fit within the definition of a defamatory statement. In the 2003 incident, the comment "all niggers look alike" did not reference the plaintiff specifically and did not go to third-party opinion on his reputation or stature as contemplated by the tort.  The racial slur "nigger" also is not something subject to truth or falsity. The phone incident in 2004 suffers from the same deficiencies.  In addition, there is no evidence that either Janeway or Hric wrote "nigger" on the phone in 2004.  On this basis alone, the plaintiff's defamation claim fails.

Finally, the plaintiff's extreme misrepresentations of the record in this case must be addressed.  In responding to the defendants' motions for summary judgment, the plaintiff has represented to this court that (1) the school admitted that

17

Matthew was being "forced" from school due to racial discrimination; (2) that VCS "confided in" Janeway; (3) that Brist and Gordon acknowledge a history of racial integration problems at VCS; and (4) that VCS altered the video of the payphone, in addition to other (relatively) lesser factual misstatements. By contrast, the undisputed evidence is that Antonio altered Matthew's withdrawal papers to suggest racial discrimination and then refused to sign them until Brist had. These facts cannot be construed as an admission by VCS.  Second, there is no evidence that VCS confided in Janeway. Third, there is no evidence before this court that VCS has a history of problems with racial integration, and absolutely no evidence that Brist and Gordon have acknowledged one. Finally, there is no evidence that the video was altered or that it showed "the perpetrators writing "NIGGER" on the payphone in January 2004," as the plaintiff states. (Pl. Brief, p. 5). These  statements go far beyond the bounds of creative lawyering and fall into sanctionable conduct under Federal Rule of Civil Procedure 11(b)(3). While the court declines to impose sanctions at this time, the plaintiff's counsel is admonished to adhere to the record in future filings in federal court.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendants, Valparaiso Community Schools, Kenneth Brist, and George Gordon, on August 31, 2005 is **GRANTED,** and the

18

Motion for Summary Judgment filed by the defendant, Celess Janeway, on August 31, 2005 is **GRANTED**.

ENTERED this 27th day of February, 2006

                                                    s/ ANDREW P. RODOVICH
                                                      United States Magistrate Judge